IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JARED BULAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 02: 10-cv-1608 |
| ) | |
| MICHAEL ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

October 31, 2011

**I.      Introduction**

Plaintiff, Jared Bular, brought this action pursuant to 42 U.S.C. § 405(g), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403.

**II.     Background**

Plaintiff was born on April 11, 1983, and was twenty-six years old at the time the Administrative Law Judge ("ALJ") issued his decision. (R. 15). He is a high school graduate, capable of communicating in English, and has worked approximately 20 hours per week as a stock room laborer at a Dick's sporting goods store ("Dick's") since 2007. According to Plaintiff, his job duties include unloading trucks, cleaning, and conducting general maintenance around the store. (R. 27). He also testified that on occasion his employer assigned him to stand by the front door of the store to greet customers. (R. 27-28).

Other than the position at the sporting goods store, Plaintiff has no past relevant work experience. (R. 15).

Plaintiff alleges disability as of January 1, 2006, due to a learning disability, Asperger's syndrome, attention deficit disorder, and asthma. Although Plaintiff worked after his alleged onset date, the ALJ determined that Plaintiff's earnings were below the threshold for a finding of substantial gainful activity. (R. 11).

### A. Plaintiff's Physical Health History

While Plaintiff took medication for asthma and allergies, the record reflects that he does not suffer from any physically disabling conditions. (R. 162, 287, 292). For example, Plaintiff indicated in a disability function report submitted to the state agency that he could walk three miles or more without rest and had no other difficulties walking. (R. 143). Furthermore, after a July 9, 2007 check-up, Plaintiff's primary care physician Harry Silvis, M.D., reported that Plaintiff had not experienced an asthma attack since 2002. (R. 299). Approximately one year later, Dr. Silvis noted that Plaintiff was working regularly and only using his inhaler (Maxair) once per week. (R. 295).

### B. Plaintiff's Mental Health History

In late September 1991, Plaintiff underwent the Wechsler Intelligence Scale for Children, Revised Test, which was given by a school psychologist, Evelyn Ruschel. (R. 110). Plaintiff, who was then ten years old, registered a verbal IQ of 80, a performance IQ of 84, and a full scale IQ of 80; taken together, the results revealed low average intelligence. (R. 110, 167, 175, 224, 230). Prior tests had showed a range of intelligence scores, including an

2

IQ score of 108 when Plaintiff was five years old, based on the Stanford-Binet Intelligence Scale-Form L-M. (R. 167, 169, 224-25). According to Plaintiff's school psychologist, such variation was consistent with a learning disability, and the IQ score was only a minimal assessment of Plaintiff's actual intellectual capabilities. (R. 177, 229). As a result of the test scores, Plaintiff was placed in learning support classes from the second grade onward. (R. 135). He also received speech therapy. (R. 263). When he was in high school, however, he was mainstreamed under an individual education program. (R. 205-08).

On December 6, 2001, Plaintiff was administered the Wechsler Adult Intelligence Scale IQ Test, Third Edition ("WAIS-III"), on which he registered a full scale IQ of 72, placing him in the borderline range of intellectual functioning. (R. 182, 242). A few months later, on April 18, 2002, he was again administered the WAIS-III, the results of which showed a full scale IQ of 77, a verbal IQ of 75, and a performance IQ of 83. (R. 189, 232). Plaintiff's full scale IQ again placed him in the borderline range of intellectual functioning. (R. 195). However, Nikolas Martin, Ed.D., who administered the test, opined that the results mildly underestimated Plaintiff's true intellectual functioning. (R. 236). In his view, Plaintiff could handle training and employment-related experiences of a mildly complex nature and was "best suited for mildly complex visual related activities linked to the [r]ealistic realm that may involve assembly, repair, maintenance or installation related activity." (R. 195, 236). Furthermore, Dr. Martin concluded that, despite Plaintiff's arithmetic disability, and reading decoding, reading comprehension, spelling, and expressive writing comprehension deficits, he had average nonverbal visual reasoning-related abilities, good physical health with both

3

fine and gross motor skills intact, and a high degree of vocational motivation.  (R. 201, 203, 239-40).

On June 21, 2006, Plaintiff began seeing a psychologist, Avril D. Zaharoff, Ph.D., for treatment of his ADD, at the recommendation of Dr. Silvis.  (R. 309, 245-46).  Plaintiff saw Dr. Zaharoff until October 20, 2006, when he started working at a toy factory.  (R. 252).

Two months later, on December 20, 2006, Plaintiff, who was having difficulty functioning in a work situation, began seeing Ravi Kant, M.D., at the recommendation of the Pennsylvania Office of Vocation Rehabilitation (R. 247-48, 255-57, 263, 327-28).  During his initial visit with Plaintiff, Dr. Kant noted that he appeared "calm and pleasant and somewhat shy and reluctant to talk." (R. 263).  Additionally, he displayed no obvious symptoms of depression, anxiety, or psychosis and did not have behavioral issues.  (R. 263).  Dr. Kant opined that Plaintiff had borderline intellectual functioning and mild dysarthria.  (R. 263). Dr. Kant further opined that Plaintiff appeared to be somewhat concrete in his thinking process, but his insight and judgment were fair.  (R. 263).  As a result of his findings, Dr. Kant diagnosed Plaintiff with Asperger's disorder and ADD without hyperactivity, for which he prescribed Adderall.  (R. 263).

On January 17, 2007, Dr. Kant noted that Plaintiff was tolerating his dosage of Adderall, which seemed to increase his ability to pay attention at home.  (R. 265).  Although Plaintiff experienced a few sleepless nights and lost weight, he had no major side effects.  (R. 265).  Accordingly, Dr. Kant continued Plaintiff on Adderall.  (R. 265).

One month later, Dr. Kant reported that Plaintiff continued to respond well to Adderall and felt "more alert with medication and able to do things without being told." (R. 267). In addition, according to Dr. Kant's treatment notes, Plaintiff was continuing to stay busy around the house, but had not been in any work situations. (R. 267). After the check-up, Dr. Kant raised Plaintiff's Adderall dosage to 30 milligrams. (R. 268).

At their next visit on April 12, 2007, Dr. Kant reported that Plaintiff experienced no side effects from his medication. (R. 269). He also indicated that Plaintiff was calm, pleasant, and interactive, with no obvious symptoms of depression or anxiety. (R. 269). Furthermore, it was noted that Plaintiff was scheduled to begin a job shadowing program, which, according to Dr. Kant, Plaintiff "fe[lt] good about it." (R. 269). On June 14, 2007, Dr. Kant again indicated in his notes that Plaintiff continued to experience no medication side effects. (R. 269). Dr. Kant also noted that Plaintiff had obtained a part-time job with a cabinet maker and that he "fe[lt] good about it." (R. 269).

Dr. Kant next saw Plaintiff on August 9, 2007, at which time he reported that Plaintiff continued to work one or two days a week with the cabinet maker. (R. 274). According to Dr. Kant's notes, Plaintiff was struggling with his mood because he had received "many rejections when [he] put in [job] applications." (R. 274). On the other hand, Dr. Kant also indicated that Plaintiff had been doing many things on his own without being told as often. (R. 274).

Before Plaintiff's next appointment with Dr. Kant, he obtained a job at Dick's in Washington, Pennsylvania. (R. 275). On October 11, 2007, Dr. Kant recorded in his notes

5

that Plaintiff was happy about his new job. (R. 275). Dr. Kant also opined that Plaintiff was doing better in taking initiative and doing things while on Adderall. (R. 276).

Over the next several months, Dr. Kant documented that Plaintiff's mental health condition remained stable. For example, in early December 2007, Dr. Kant remarked that Plaintiff was doing well at work, although his hours had recently been cut due to the holidays. (R. 275). On January 31, 2008, Dr. Kant noted that Plaintiff had been feeling happy overall because he was doing well at work, he had stopped losing weight, and his mood was stable. (R. 279). Dr. Kant indicated again on March 27, 2008 that Plaintiff was still tolerating Adderall without difficulty and that his attention was good. (R. 281). He made similar statements in May, July, and September 2008, each month noting that Plaintiff was doing "fairly good at work." (R. 283-85).

On August 12, 2008, Dr. Silvis, Plaintiff's primary care physician, completed a questionnaire regarding Plaintiff's mental functioning. (R. 290-91). He indicated that Plaintiff had a marked restriction in understanding, remembering, and carrying out detailed instructions and making judgments on simple work-related decisions, and a moderate restriction as to short, simple instructions. (R. 290). He further indicated that Plaintiff had moderate restrictions in responding appropriately to supervision, co-workers, and work pressures. (R. 290). In addition, Plaintiff's reasoning and ability to follow directions were moderately impaired, which Dr. Silvis attributed to Plaintiff's Asperger's disorder and ADD. (R. 291).

6

At the request of the state agency, Plaintiff underwent an examination by T. David Newman, Ph.D., on September 26, 2008. (R. 332-36). According to Dr. Newman, Plaintiff had no difficultly establishing a rapport and his mood was stable. (R. 333). He maintained good eye contact and did not seem anxious. (R. 333). In addition, he appeared alert and appropriately responsive to questions and had clearly articulated speech with consistently relevant, rational, and coherent content. (R. 333). Dr. Newman found a marked limitation in Plaintiff's ability to understand, remember, and carry out short, simple instructions; extreme limitation in his ability to understand, remember, and carry out detailed instructions; and a moderate limitation in his ability to make judgments on simple, work-related decisions. (R. 334). Furthermore, Dr. Newman opined that Plaintiff was not limited in responding appropriately to supervision, co-workers, and work pressures. (R. 334).

Dr. Newman found that Plaintiff's concentration ability was undisturbed. (R. 333). He noted that Plaintiff's abstract thinking was for the most part intact, while his concept formation was fully intact. (R. 333). Although Plaintiff demonstrated subtraction difficulty with serial sevens and serial threes, he was able to recite the months of the year in reverse without error. (R. 333). Plaintiff's memory was deficient with regard to immediate verbal recall; however, he could recall relevant events from his past, what he did two days prior to the examination, and what he ate the previous day and the morning of the examination. (R. 333). Plaintiff's social judgment and test judgment both were sufficient, and Dr. Newman opined that Plaintiff had good insight. (R. 334).

7

In Dr. Newman's opinion, Plaintiff did not have Asperger's disorder or ADD, the symptoms of which would have appeared at an earlier age. (R. 334). Instead, Dr. Newman diagnosed Plaintiff with an unspecified learning disorder, finding that "there appeared to be some difficulty with retention of instructions and immediate verbal recall." (R. 334). Despite those difficulties, Dr. Newman concluded that Plaintiff could competently manage his personal funds. (R. 334).

On October 7, 2008, state agency psychologist Michelle Santilli, Psy.D., reviewed Plaintiff's record. (R. 335). Dr. Santilli found that Plaintiff's basic memory processes were intact and that he was able to perform simple, routine, repetitive work in a stable work environment. (R. 335-54). Furthermore, in her view, Plaintiff could manage an ordinary routine without supervision, as he could understand, retain, and follow simple instructions. (R. 339). Dr. Santilli reviewed the opinions of both Dr. Silvis and Dr. Newman. (R. 339). She felt that Dr. Newman's opinion, particularly his judgment as to Plaintiff's occupational adjustment abilities, was inconsistent with the totality of the evidence and was also internally inconsistent, which rendered it less persuasive. (R. 339).

The record reflects that Plaintiff continued to function well at home and at work throughout much of 2008 and 2009, as documented in treatment notes received after the state agency's review of Plaintiff's file. On December 16, 2008, Dr. Kant recorded in his treatment notes that Plaintiff's mother, with whom he resided, had been visiting his father in Arizona, and as a result, Plaintiff had been living mostly by himself. (R. 371). Although he had lost about fifteen pounds, he had no new issues and was doing well at home and work.

(R. 371). Plaintiff was still getting along well at work on February 10, 2009, according to Dr. Silvis' notes. (R. 369). Similarly, a month later, Dr. Kant noted that Plaintiff had been independent and had done well taking care of himself. (R. 367). He was also logging approximately twenty-eight hours per week at work, where he continued to do well. (R. 367).

By August 25, 2009, Plaintiff was no longer taking Adderall on the weekends, and he did not notice a difference. (R. 361). Dr. Kant's notes from the August 25 visit and an October 20 visit reveal that Plaintiff was still doing well at work. (R. 361). In mid-December 2009, Dr. Kant noted that Plaintiff was staying busy with work, although he was only part-time and not getting enough hours. (R. 357). In addition, Dr. Kant noted that Plaintiff was experiencing weight gain and usually displayed a good mood. (R. 357). On February 9, 2010, Dr. Kant again noted that Plaintiff was doing well at work, but he was still not getting enough hours. (R. 356). Furthermore, Dr. Kant opined that Plaintiff had issues processing information, thinking concretely, and functioning without help at work. (R. 356). In Dr. Kant's view, Plaintiff needed monotonous simple jobs without disruptions, much decision making, and uncertainty. (R. 356).

In a questionnaire dated April 13, 2010, Dr. Silvis indicated that Plaintiff could work on a part-time basis. (R. 376) Plaintiff's ability to understand, remember and carry out complex job instructions was poor. (R. 378). His ability to understand, remember, and carry out detailed, but not complex, instructions, however, was fair; and his ability to understand, remember, and carry out simple instructions was considered good. (R. 378). Dr. Silvis also noted that Plaintiff was unable to handle money or count. (R. 378). Dr. Silvis further

9

indicated that Plaintiff's ability to maintain his personal appearance and behave in an emotionally stable manner was good, while he showed a fair ability to relate predictably in social situations and demonstrate reliability. (R. 378). With respect to Plaintiff's ability to make occupational adjustments, Dr. Kant checked boxes to indicate that Plaintiff had good-to-fair ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, and maintain attention and concentration. (R. 377). On the other hand, Plaintiff demonstrated a poor ability to use judgment, deal with work stress, and function independently. (R. 377). According to Dr. Kant, his assessment of Plaintiff's abilities was supported by Plaintiff's Asperger's syndrome. (R. 378).

    C.    <u>Procedural History</u>

Plaintiff initially filed an application for DIB on July 21, 2008, in which he claimed total disability since January 1, 2006. The claim was initially denied, and Plaintiff timely filed a written request for hearing on December 11, 2008. An administrative hearing was held on May 7, 2010 in Pittsburgh, Pennsylvania before Administrative Law Judge William E. Kenworthy, at which Plaintiff was represented by counsel and testified. Also testifying was Mary Beth Kopar, M.Ed., an impartial vocational expert ("VE").

On May 11, 2010, the ALJ rendered an unfavorable decision to Plaintiff in which he found that Plaintiff retained the ability to perform a full range of work at all exertional levels but with the following non-exertional limitations: he is "limited to one or two step activities that would not require dealing with the general public or maintaining close interaction and cooperation with coworkers." (R. 13). Accordingly, because the VE testified that jobs existed

in the national economy that could be performed by an individual with such limitations, the ALJ concluded that Plaintiff was not "disabled" within the meaning of the Act. The ALJ's decision became the final decision of the Commissioner on October 8, 2010, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ.

On December 3, 2010, Plaintiff filed his Complaint in this Court in which he seeks judicial review of the decision of the ALJ. The parties have filed cross-motions for summary judgment. Plaintiff contends that the ALJ erred by (1) improperly weighing the medical records and opinion of Plaintiff's treating psychiatrist, Dr. Kant, and inappropriately engaging in his own medical diagnosis; and (2) failing to properly weigh all of the evidence of record. The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence. The Court agrees and will therefore grant the motion for summary judgment filed by the Commissioner and deny the motion for summary judgment filed by Plaintiff.

**III.**     **Legal Analysis**

   A.     Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Capato v. Commissioner of Social Security*, 631 F.3d 626, 628 (3d Cir. 2010) (internal citation omitted). It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Commissioner of Social Security*, 625 F.3d 798 (3d Cir. 2010).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Newell v. Commissioner of Social Security*, 347 F.3d 541, 545-46 (3d Cir. 2003) (*quoting Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Halter*, 247 F.2d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1) (1982).

This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or,

12

>   (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart,* 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Commissioner of Social Security,* 577 F.2d 500, 502 (3d Cir. 2010); 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

In this case, the ALJ determined that Plaintiff was not disabled within the meaning of the Act at the fifth step of the sequential evaluation process. Based on the VE's testimony, the

ALJ concluded that there are a significant number of jobs in the national economy, such as laundry worker, cleaner, sorter, and material handler, which Plaintiff could perform despite the restrictions accounted for in his RFC assessment.

B.   Discussion

As set forth in the Act and applicable case law, this Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3rd Cir. 1986), *cert. denied.*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'n of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999).

Plaintiff argues that the ALJ gave inappropriate treatment to the medical records and opinions provided by his treating psychiatrist, Dr. Kant. According to Plaintiff, "[a]ll of Dr. Kant's treatment notes were submitted in this case as well as a 4-page opinion statement," and the ALJ erred "by failing to even mention, let alone properly weigh, this important information." Plaintiff's Brief at 4. The Commissioner, however, avers that the medical evidence, medical opinions of record, and Plaintiff's own testimony supported the ALJ's finding that Plaintiff's mental impairments did not prevent him from performing the jobs identified by the VE. The Court agrees with the Commissioner.

In general, an ALJ must accord "treating physicians' reports great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Brownawell v. Commissioner of Social Security,*

14

554 F.3d 352, 355 (3d Cir. 2008) *(quoting* Morales v. Apfel, *225 F.3d 310, 317 (3d Cir. 2000));* 20 C.F.R. § 404.1527(d)(2) (providing that a treating physician's opinion should receive controlling weight when it is well-supported by medical evidence and consistent with the other substantial evidence in the record). However, while an ALJ may not draw speculative inferences from medical reports or base his decision on his own "credibility judgments, speculation, or lay opinion," he may reject a treating physician's opinion outright on the basis of conflicting evidence in the record. *Morales,* 225 F.3d at 317-18 (citing *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999)). In doing so, the United States Court of Appeals for the Third Circuit has instructed that an ALJ must at least "consider all the evidence and give some reason for discounting the evidence she rejects." *Plummer,* 186 F.3d at 429.

In reaching his decision, the ALJ considered the opinion of Plaintiff's primary care physician, Dr. Silvis, including a four-page medical statement completed on April 13, 2010. (R. 14). In his opinion, the ALJ noted that Dr. Silvis' April 13 assessment, which indicated that Plaintiff's ability to understand, remember, and carry out complex tasks, use judgment, deal with work stress, and function independently, was inconsistent with the medical evidence of record, including earlier check-mark forms completed in 2008 by Dr. Silvis. (R. 14). Those earlier findings, according to the ALJ, were consistent with his RFC finding and the weight of the medical evidence.

The ALJ also considered the opinions of Dr. Newman, who saw Plaintiff for a one-time consultative evaluation on September 28, 2008, and Dr. Santilli, who reviewed the evidence at the state agency level. (R. 14). He found that Dr. Newman's conclusion with

respect to Plaintiff's limitations in carrying out simple tasks was "simply unsupported by anything contained in the report of the interview." (R. 14). The ALJ found further support for his rejection of Dr. Newman's conclusion in Dr. Santilli's opinion that Plaintiff could sustain an ordinary work routine without special supervision. (R. 14).

In addition, the ALJ made reference to medical records from Dr. Kant, which reflected that Plaintiff "has been staying busy with work, doing well at work . . . still doing only part-time work, not getting enough hours there." (R. 9). While the ALJ did not expressly indicate how much weight he was according Dr. Kant's observations, he noted that the statement that the Plaintiff had been doing well at work but not getting enough hours reflected a limitation upon vocational opportunity and not a limitation upon the claimant's inherent ability. (R. 15).

Plaintiff contends that the ALJ's statement regarding Dr. Kant's records was not based on medical evidence but was "pure speculation [as to Plaintiff's ability to work full-time] after reading one sentence out of a vast number of treatment notes." Plaintiff's Brief at 6 (citing *Morales*, 225 F.3d at 317 (concluding that "[t]he ALJ cannot, as he did here, disregard this medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.'")) (internal citations omitted). The Court disagrees. The ALJ did not infer from Dr. Kant's records that Plaintiff could work on a full-time basis. Rather, he correctly determined that the fact that Plaintiff's employer slashed his hours was unrelated to his ability to perform work-related tasks. Furthermore, in a December 6, 2007 treatment note, Dr. Kant reported that "Plaintiff's work hours are cut at

Dick's due to [the] holidays. [He is] handling it well." (R. 277). Such a statement suggests that Plaintiff found himself capable of working additional hours, presumably with certain limitations.

Indeed, considered as a whole, Dr. Kant's medical records actually support the ALJ's finding that Plaintiff could perform work existing in the national economy. Nowhere in the forty-four pages of medical records from Dr. Kant does he indicate that Plaintiff has any significant limitations in his ability to work. Rather, he repeatedly opined that Plaintiff was doing well at work. In addition, he noted on several occasions that Plaintiff was able to care for himself and was responding well to Adderall. Importantly, although Dr. Kant recognized that Plaintiff struggled with information processing, thinking concretely, functioning without help at work and was best suited for simple, monotonous jobs, most of those limitations were accounted for in the ALJ's RFC finding. (R. 13).

Plaintiff also contends that the ALJ "inappropriately ignored [Dr. Kant's] entire 4-page opinion and never even mentioned it in his decision." Plaintiff's Brief at 6-7. Having reviewed the record in its entirety, the Court is unable to find an opinion statement submitted by Dr. Kant. In fact, the pages of the record to which Plaintiff cites as containing such an opinion, pages 376-78, actually contain the questionnaire completed on April 13, 2010 by Dr. Silvis. As discussed above, the ALJ expressly rejected the opinion set forth in that questionnaire in favor of contrary medical evidence in the record and provided a thorough rationale for his doing so. Accordingly, Plaintiff's argument is entirely without merit.

17

**IV.** **Conclusion**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that he is able to perform a wide range of work at all exertional levels but with several non-exertional limitations.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JARED BULAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 02: 10-cv-1608 |
| | ) |
| MICHAEL ASTRUE, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

**AND NOW**, this 31st day of October, 2011, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1. Plaintiff's MOTION FOR SUMMARY JUDGMENT is DENIED.

2. Defendant's MOTION FOR SUMMARY JUDGMENT is GRANTED.

3. The Clerk will docket this case as closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:      Kelie C. Schneider, Esquire
kschneider@peircelaw.com

Christy Wiegand, Esquire
Christy.wiegand@usdoj.gov